**RCD CLEANING SERVICE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**Federal Maintenance Hawaii, Inc., Intervenor-defendant.**

**No. 11–13 C.**

United States Court of Federal Claims.

April 13, 2011.[1]

See also 97 Fed.Cl. 602.

---

1. This opinion was issued under seal on March 30, 2011. Pursuant to ¶ 6 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ( [ ] ) identify the redacted portions of the opinion.

583

John R. Tolle, McLean, VA, for plaintiff.
Bryan R. King, McLean, VA, of counsel.

Alex P. Hontos, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Alan J. Lo Re, Assistant

Director, Washington, DC, for defendant. Major Joseph E. Krill, United States Army, Arlington, VA and Beverly Hazlewood Lewis, United States Small Business Administration, Washington, DC, of counsel.

David J. Taylor, Washington, DC, for intervenor-defendant. Katherine A. Allen and Rachel W. McGuane, Washington, DC, of counsel.

## OPINION AND ORDER

BUSH, Judge.

RCD Cleaning Service, Inc. (RCD) filed its post-award bid protest complaint on January 6, 2011. In its complaint, RCD challenges the decision by the United States Small Business Administration (SBA) decertifying RCD from the Historically Underutilized Business Zone (HUBZone) program, 15 U.S.C. § 657a (2006), after which the United States Army (Army) cancelled an award to RCD under Solicitation No. W912CN–10–R–0045. The contract was then awarded to Federal Maintenance Hawaii, Inc. (FMH), the incumbent contractor. The contract is for custodial services for numerous buildings on Oahu, Hawaii.

RCD seeks injunctive and declaratory relief in order to restore its HUBZone certification and to fairly compete for the contract work. FMH has intervened in this suit. Plaintiff's bid protest is now before the court on defendant's motion to dismiss for lack of jurisdiction, and on cross motions for judgment on the administrative record brought pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).

The administrative record (AR) of this procurement was filed on January 20, 2011, and the AR was corrected on January 28, 2011. Briefing was filed according to an expedited schedule and oral argument was held on March 4, 2011. As discussed below, the court has jurisdiction over this protest, but SBA's decertification decision, reviewed under a deferential standard, was not irrational. Defendant's motion to dismiss is therefore denied, defendant's and intervenor-defendant's motions for judgment on the administrative record are granted, and plaintiff's motion for judgment on the administrative record is denied.

## BACKGROUND

This protest questions whether SBA's decision to decertify RCD from the HUBZone program was justified. The court restricts its initial discussion of the factual background of this case to a basic chronology of events pertinent to its review of SBA's decision. In the discussion section of this opinion, the court will examine more specific facts as it reviews the parties' arguments.

RCD, a contractor providing "custodial, specialized cleaning, grounds maintenance, and related services," AR at 813, received HUBZone certification in 2006 and HUBZone recertification in 2009, id. at 1612, 2843.[2] On October 15, 2010, RCD was awarded a large contract by the Army for custodial services in Hawaii, a contract which was set aside for HUBZone contractors. AR at 858. FMH, the incumbent contractor and the only other timely offeror, hired a private investigator who collected data on RCD's operations. AR at 1619. On the basis of its investigations and research, FMH filed a timely HUBZone status protest alleging that "35% of RCD's Employees Do Not Live in a HUBZone" and that "RCD's Principal Office Is Not Located Within a HUBZone." AR at 1619–20. The court notes that both the employee residency requirement and the principal office location requirement are conditions for participation in the HUBZone program.

After processing the status protest and requesting information from RCD in order to confirm RCD's HUBZone qualifications, on November 16, 2010, SBA sustained FMH's status protest, ruling that RCD had not shown that its principal office was located in

---

**2.** "The purpose of the HUBZone program is to provide federal contracting assistance for qualified [small business concerns] located in historically underutilized business zones in an effort to increase employment opportunities, investment, and economic development in such areas." 13 C.F.R. § 126.100 (2010). RCD asserts that its principal office is located in a HUBZone in Phoenix, Arizona.

a HUBZone.[3] AR Tab 20. The Army was notified of RCD's decertification from the HUBZone program, and, due to the HUBZone certification requirement for the custodial services contract, terminated RCD's contract on November 17, 2010. AR Tab 13. The Army then awarded the custodial services contract to FMH on December 2, 2010. AR at 1228.

RCD appealed SBA's decision, but the appeal was denied on December 21, 2010. AR Tab 24. RCD then filed its bid protest in this court on January 6, 2011, expressing its belief that FMH had not yet begun performance of the contract. Upon learning that FMH had been performing services under the contract for some weeks, the parties agreed to a briefing schedule whereby the court would simultaneously decide the merits of plaintiff's challenge to SBA's decertification decision and resolve plaintiff's request for permanent injunctive relief.[4]

## DISCUSSION

### I. Standard of Review for a Motion Brought under RCFC 12(b)(1)

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 814–15, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). However, plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), and must do so by a preponderance of the evidence, *Reynolds,* 846 F.2d at 748 (citations

omitted). If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

### II. Bid Protest Jurisdiction

■ This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

### III. Standard of Review for Judgment on the Administrative Record

■ RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed.Cir. 2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### IV. Bid Protest Review

■ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is

---

3. RCD was able to show that at least 35% of its employees resided in a HUBZone at the appropriate times.

4. RCD later filed a related protest in this court challenging this same SBA HUBZone decertification decision in the context of another procure-

ment for which RCD was the apparent successful offeror. *See RCD Cleaning Serv., Inc. v. United States,* No. 11–89C (Fed.Cl. filed Feb. 10, 2011) (*RCD II*). The outcome of each protest is necessarily the same.

present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE* )). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE*, 258 F.3d at 1302). A protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing before this court. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307–08 (Fed.Cir.2006) (citations omitted).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed.Cir.2001)). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058.

*De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc.*

*v. United States*, 854 F.2d 464, 466 (Fed.Cir. 1988)). Examples of arbitrary and capricious agency action include when "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed.Cir.2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted).

" 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## V. Standing

Only a protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement and standing before this court. *Rex Service*, 448 F.3d at 1307–08. Neither defendant nor intervenor-defendant challenges RCD's standing to bring this protest. Here, RCD was awarded the contract, and, but for SBA's decertification decision, had a substantial chance of performing the contract. For this reason, RCD has standing to bring this bid protest.

## VI. Defendant's Jurisdictional Challenge

■ Defendant argues that matters of contract administration, and terminations for convenience in particular, are the proper subject of suits brought under the Contract Disputes Act of 1978(CDA), 41 U.S.C.A. §§ 7101–09 (LexisNexis, Lexis through P.L. 111–383), not of suits brought under this court's bid protest jurisdiction, 28 U.S.C. § 1491(b) (2006). The government contends that this bid protest is, in essence, a CDA claim challenging the Army's termination for convenience of RCD's contract. The court, however, agrees with RCD's assertion that the complaint challenges the SBA decision, not the Army's termination for convenience. In its reply, defendant suggests that an awardee whose contract has been terminated for the convenience of the government cannot bring a bid protest in this court. *See* Def.'s Reply at 2 (stating that "the argument is that when the Government terminates a contract for convenience, the terminated awardee's only jurisdictional basis for a challenge in this Court is a wrongful-termination claim brought under 28 U.S.C. § 1491(a)" (2006)).

Defendant relies primarily on "an instructive example of the Court's application of these legal principles in a factually analogous context," citing *Davis/HRGM Joint Venture v. United States*, 50 Fed.Cl. 539 (2001). *See* Def.'s Mot. at 12–13. *Davis* is indeed instructive, but the case does not support defendant's argument. The plaintiff in Davis crafted a three-count bid protest complaint, which challenged the government's (1) award to a bidder other than the plaintiff; (2) improper termination for convenience of the plaintiff's contract award; and (3) incorrect termination for convenience of the plaintiff's contract award. 50 Fed.Cl. at 540–41. The court granted defendant's motion to dismiss count two and part of count three, reasoning that "[p]laintiff ha[d] failed to point to any case law supporting its position that this Court can consider its termination for convenience claim under its bid protest statute." *Id.* at 544.

The *Davis* court did reach the merits of the plaintiff's bid protest, which challenged the weight the government accorded the plaintiff's defective bid bond, a defect that was at the root of both the termination for convenience and the award to the next-in-line bidder. *Id.* at 546–49. Thus, *Davis* stands for the proposition that a termination for convenience is not the proper focus of a bid protest brought under 28 U.S.C. § 1491(b), although the underlying government procurement action which produced both a contract termination and a contract re-award may be addressed in a bid protest. Because the termination for convenience of RCD's contract is not the focus of this protest, and because the SBA decertification decision is a governmental action in connection with a procurement, *Davis* does not support the government's jurisdictional argument in this case.

This court has previously exercised jurisdiction over a bid protest challenging a decision by SBA to decertify the plaintiff from the HUBZone program, in a suit brought by an awardee whose contract award was cancelled after the concern was decertified by SBA. *Aeolus Sys., LLC v. United States*, 79 Fed.Cl. 1, 2 (2007). Although it is not clear whether a termination for convenience was the method utilized to cancel that contract awarded to the plaintiff, the *Aeolus* case supports the view that a bid protest challenging SBA's decertification of an awardee from the HUBZone program fits squarely within this court's bid protest jurisdiction. Indeed, that case was transferred to this court precisely because it was deemed to fit within this court's bid protest jurisdiction. *See* Compl. ¶ 2, *Aeolus Sys., LLC v. United*

*States,* No. 07–581C (Fed.Cl. filed Aug. 14, 2007).

Furthermore, defendant's characterization of the dispute in this case as being one of contract administration strains credulity. FMH notified the Army of its protest concerning RCD's HUBZone status on October 20, 2010. AR at 1721. Contract performance was not to have commenced until November 1, 2010. AR at 860. RCD's contract was modified on October 28, 2010 to delay contract performance until December 1, 2010. AR at 3204–05, 3501. SBA decertified RCD from the HUBZone program on November 16, 2010. AR at 2822. The Army terminated RCD's contract on November 17, 2010. AR at 1226–27. The Army then awarded the contract to FMH on December 2, 2011. AR at 1228. This record shows that plaintiff is challenging a government action by SBA which profoundly altered the outcome of a procurement.

The Federal Circuit has noted that the language of 28 U.S.C. § 1491(b) is broad in scope, and encompasses a range of government actions that are taken in connection with a procurement. *See RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999) (describing the text of the jurisdictional grant as "very sweeping in scope"). None of defendant's cited cases convince the court that this bid protest is a CDA claim, rather than a procurement-related suit. This court has entertained bid protests that challenge SBA's HUBZone determinations in suits brought by awardees and by frustrated bidders, alike. *See Diversified Maint. Sys., Inc. v. United States,* 93 Fed.Cl. 794 (2010); *Aeolus,* 79 Fed.Cl. at 2; *Mark Dunning Indus., Inc. v. United States,* 64 Fed.Cl. 374 (2005). The court believes that these suits fall squarely within this court's bid protest jurisdiction. There may indeed be certain types of bid protest cases where a dispute over a termination for convenience poses a close question as to the jurisdictional boundaries of CDA claims and bid protest claims, but this is not such a case. For these reasons, jurisdiction lies for plaintiff's bid protest.

## VII. SBA Decision to Decertify RCD from the HUBZone Program

The court turns to its review of SBA's decertification of RCD from the HUBZone program. As a threshold matter, the court notes that HUBZone status protest decisions, and the decisions of the reviewing authority deciding appeals of those decisions, are unreported. Somewhat incongruously, the SBA decisions rendered in this matter both stated that "SBA intends to make its HUBZone status protest and appeal decisions available to the public by posting them on its website," AR at 2833, 3199, but to the court's knowledge, SBA's website does not provide the public with access to HUBZone status protest or appeal decisions. Accessible SBA HUBZone decisions might provide evidence of the agency's long-standing interpretation of its own regulations, but such evidence is not available to this court. SBA HUBZone decisions also might provide evidence of the agency's customs and practices, but no such evidence is available to the court. In this case, the court has relied to a great extent on the regulations governing the HUBZone program, 13 C.F.R. pt. 126 (2010). The court has also relied to a lesser extent on SBA's Standard Operating Procedures for the HUBZone Program, http://www.sba.gov/about-sba-services/7481/11517 (last visited March 21, 2011), which is titled SBA SOP 80 06 HUBZone Program (effective date Nov. 2, 2007) (hereinafter, SOP 80 06).

### A. Principal Office in a HUBZone Requirement

One of the key requirements for participating in the HUBZone program is that the concern's "principal office" be located in a HUBZone. To qualify for federal contracts set aside for the HUBZone program, this requirement must be met both on the day a proposal is submitted and on the day the contract is awarded. There are three key regulatory provisions that help identify a concern's principal office. First, there is the definition of "employee," which has a particular meaning for HUBZone purposes. According to the relevant part of the regulation, "[e]mployee means all individuals employed on a full-time, part-time, or other basis, so

long as that individual works a minimum of 40 hours per month." 13 C.F.R. § 126.103. Second, the general rule for determining the principal office of a concern is that "[p]rincipal office means the location where the greatest number of the concern's employees at any one location perform their work." *Id.* Third, for service industry concerns such as RCD, "the determination of principal office *excludes* the concern's employees who perform the majority of their work at job-site locations to fulfill specific contract obligations." *Id.* (emphasis added). For the sake of simplicity, the court will refer to these service industry employees who spend the majority of their work time at contract job sites fulfilling specific contract obligations as "job-site employees." Thus, a service industry concern's principal office is the location where the greatest number of non-jobsite employees work.

The court noted at oral argument that the regulation does not address every possible permutation of a concern's staffing arrangements. The regulation does not indicate, for example, where an employee who evenly splits his or her time between two offices would be counted. The regulation also does not clearly indicate whether an employee who splits his or her time between two offices (*e.g.*, three days at one, and two days at the other), would be counted only at the first office, or would be counted at both offices. These ambiguities, however, are not central to the dispute in this case.

## B. Regulatory Guidance as to Time Constraints and Adverse Inferences Relevant to Status Protests

### 1. Time Constraints

SBA does not have unlimited time to decide HUBZone status protests. The regulation, in pertinent part, contains two statements regarding the time allowed for processing a HUBZone status protest: (1) "SBA will determine the HUBZone status of the protested HUBZone SBC [Small Business Concern] within 15 business days after receipt of the protest"; (2) "If SBA

does not contact the contracting officer within 15 business days, the contracting officer may award the contract, unless the contracting officer has granted SBA an extension." 13 C.F.R. § 126.803(b)(1)–(2). The regulation either mandates or strongly urges SBA to complete a HUBZone status protest within fifteen business days.

The record does not show when SBA received the HUBZone status protest lodged against RCD.[5] The regulation requires that "SBA immediately will notify the contracting officer and the protestor *of the date* SBA receives a protest and whether SBA will process the protest or dismiss it." 13 C.F.R. § 126.803(a)(1) (emphasis added). The only document in the record that might partially address this regulatory requirement is an undated SBA letter which does not identify the date SBA received the status protest, but which does indicate that FMH's protest was timely and specific, and that the protest would not be dismissed. AR at 1721–25. This notification letter was sent via facsimile to the Army's contracting officer and FMH on October 29, 2010. *Id.* at 1726–27. The record shows that SBA received the status protest no later than October 25, 2010. AR at 1731. SBA decided the status protest on November 16, 2010, fifteen business days after October 25, 2010, perhaps within the fifteen business day time-frame indicated in the regulation.

SBA sent the same notification letter to [ ] RCD, on October 29, 2010, along with a copy of FMH's protest of RCD's HUBZone status. *See* AR at 1721, 1728–30; *see also* AR Tab 16. The letter requested numerous documents that would be relevant to a determination of the validity of the two specific challenges to RCD's HUBZone status. The letter contained a warning that "failure to provide sufficient information or supporting documents to establish RCD's HUBZone eligibility may result in an adverse inference." AR at 1724. In addition, SBA informed RCD that "after review of the documents requested and received, the program office may have further requests for additional

---

5. The administrative record in this case is poorly organized and labeled, and appears to be less than complete, as discussed *infra.*

documents or clarification of information." *Id.* The letter also warned RCD that SBA's decision would be effective immediately and would be final, unless overturned on appeal. *Id.* RCD was given five business days to respond to SBA's requests for information and documentation, with the deadline set for November 5, 2010.

Before going further, the court notes that SBA's notification letter to RCD generally follows the guidance of the regulation and SOP 80 06. The regulation sets the time-frame for the protested concern to provide documentation supporting its HUBZone status. 13 C.F.R. § 126.803(a)(2). The text and format of the letter are drawn from SBA's standard operating procedures.[6] *See* SOP 80 06, Ch. 3(6)(b), (9) & App. B. Thus, even though the information and documentation demands on RCD, especially in light of the short amount of time allowed for returning the information to SBA, may seem burdensome, SBA's requests for "sufficient information or supporting documents to establish RCD's HUBZone eligibility," set forth in the October 29, 2010 letter, appear to be sanctioned by the governing regulation and SBA's standard operating procedures.

### 2. Adverse Inferences

The HUBZone regulation does not, in the context of status protests, explicitly address the question of what adverse inferences may be drawn from a protested concern's failure to adequately respond to requests for information from SBA as it investigates the allegations of a status protest. *See* 13 C.F.R. § 126.803(a)(2) (stating simply that "[t]he protested HUBZone [concern] may submit information responsive to the protest within 5 business days"). There are other provisions in the HUBZone regulation, however, which state that SBA has the right to examine a HUBZone concern's qualifications at any time, has the right to request additional information from a HUBZone concern, and

has the right to draw adverse inferences from a failure to respond to an SBA request for information. *See id.* §§ 126.402, 126.403. It is also SBA's standard practice to warn protested concerns that "failure to cooperate [with a status protest investigation] may result in an adverse inference." SOP 80 06, Ch. 3(6) & App. B.

The court notes, however, that SBA requests for information, and SBA's right to draw adverse inferences from the failure of a HUBZone concern to adequately respond to such requests for information, must be grounded in rationality. It would be irrational to request information that is not relevant to a principal office determination, for example, when attempting to confirm the location of a concern's principal office. Similarly, a request for information that is impossible to decipher could not be the grounds for an adverse inference.

The court notes, too, that SBA has stated objectives and guidelines for resolving a status protest within its standard operating procedures. "The objective of the HUBZone status protest evaluation is to determine if the protested HUBZone [concern] was in fact qualified for the HUBZone program at the time it submitted its offer/bid and at the time of award." SOP 80 06, Ch. 3(10)(a). SBA employees are notified of this guideline: "If the response from the protested firm is incomplete, request further information from the protested concern until sufficient information is provided to make a determination of program eligibility." *Id.* Ch. 3(10)(a)(2). Given the expedited consideration of such protests required by the HUBZone regulation, however, it would not be possible for SBA, in every instance, to delay its decision of a status protest to accommodate a protested concern's repeated and ineffectual attempts to establish its HUBZone qualifications.[7]

---

6. SOP 80 06 also refers to an Appendix L, a document which purportedly lists relevant documents that may be requested from a challenged HUBZone concern. No Appendix L is available on the SBA website.

7. The court is troubled by the chronology of events here. Although the record does not contain the date SBA received the status protest,

approximately one third of the time allotted for the review of such protests was spent processing this protest before informing RCD of the protest. Then, after RCD had met its deadline, SBA took approximately five business days to review RCD's submission and find it deficient. This left RCD only twenty-four hours to document the work locations for more than one hundred em-

## C. SBA Requests for Information in the October 29, 2010 Letter

Fortunately, unlike [ ], the court need not consider each and every one of the information requests in the SBA letter. The court reproduces here the most relevant information and document requests presented to RCD on October 29, 2010. The introduction to the list of requested information and documents is stated as follows: "I . . . request that you provide supporting documents evidencing that [RCD's] principal office [wa]s located within a HUBZone [at the time it submitted its offer (July 26, 2010) for the above-referenced solicitation and on the date of contract award (October 15, 2010) ]. The supporting documents should include, but are not limited to the following. . . ." AR at 1723.

The four particular requests that proved to be especially relevant to this protest are these:

(1) company payroll records showing all employees and number of hours worked per week at the time RCD submitted its offer and on the date of contract award[ ] (if there are any employees that worked less than 40 hours during the week when the offer was submitted or during the week when the contract was awarded, RCD must provide payroll records that cover the four-week period leading up to, and ending on the date of offer, and payroll records that cover the four-week period leading up to, and ending on the date of award to demonstrate that those employees worked at least 40 hours in a month as of the date of offer and the date of award);

(2) records indicating the location at which each employee performed his/her work at the time RCD submitted its offer and at the time of award;

(3) records indicating those RCD employees who were performing the majority of their work at job-site locations to fulfill specific contract obligations at the time the offer was submitted and at the time of award, identifying

(a) the job-site location at which each employee performed his or her work

(b) the contract (include a copy of the front page and other pages of the contract showing where the work must be performed) and contract number for that job-site location, and

(c) the percentage of work performed by the employee at that location;

(4) an explanation and documents addressing the specific allegations set forth in the protest.

AR at 1723–24 (re-formatted, footnote omitted).

The court summarizes its view of the task required of RCD on October 29, 2010. First, RCD was to submit official payroll records, including all employees paid the week of July 26, 2010, and all employees paid the week of October 15, 2010, which would identify the number of hours worked each of those weeks for each employee.[8] For any of the employees who worked fewer than forty hours per week, during either or both of those weeks, RCD was to provide four weeks of hours-worked data, to determine whether these employees worked forty or more hours in the month preceding the week of July 26, 2010 and/or the week of October 15, 2010.

Next, RCD was required to identify the work location of each employee, first for the week of July 26, 2010, and then for the week

---

ployees, most of whom appear to be custodial job-site employees, not office employees. If RCD had been offered more guidance earlier in this process and if the level and types of requested documentation had been tailored to better reflect what SBA expected and wished to receive, SBA might have readily obtained information sufficient to determine the location of RCD's principal office. Instead, from all appearances, SBA took the lion's share of time for its own internal processing, leaving RCD with a compressed schedule for compliance with amorphous directives.

8. Payroll summaries were not allowed:

> You must provide official company payroll records. The SBA will not accept payroll summaries. The payroll must show at a minimum the employee's name, number of hours worked for that pay period, wages, and pay period beginning and end dates. You must indicate the number of hours worked per week for every individual on the payroll, including those that are salaried and show no specific number of hours worked.

AR at 1723 n.1.

of October 15, 2010. If the worker was a "job-site employee," however, further documentation was necessary. For each of the relevant weeks for job-site employees, RCD had to identify the job-site location, as substantiated by photocopies of relevant RCD contract pages as well as contract numbers, and identify what percentage of that employee's work occurred at the job-site location.

As a final task, RCD was required to provide an explanation of why its principal office was in a HUBZone, and documents to support that explanation.

On November 5, 2010, RCD provided over nine hundred pages of information to SBA. AR Tab 18. Approximately half of the submission consisted of payroll records and summaries. *See* AR at 1740–2215. This information was sufficient for SBA to determine how many employees, as defined by the HUBZone statute, worked for RCD on July 26, 2010 and October 15, 2010. According to SBA's calculations, RCD employees numbered 159 on July 26, 2010 and 170 on October 15, 2010.[9] AR at 3022. Substantiating where those 159 employees and 170 employees worked proved to be a more difficult challenge for RCD.

### D. SBA's Second and Third Requests for Information and Documentation

RCD's initial attempt to establish that its principal office was located in a HUBZone was found deficient by SBA. At around noon on November 15, 2010, SBA emailed [ ] and identified requested information that had not been provided. The first identification of missing information that is relevant to this case read as follows:

> You have provided copies of contracts that state the job site location for 46 "employees". The term "employee" is defined in the SBA regulations as "all individuals employed on a full-time, part-time, or other basis, so long as that individual works a

minimum of 40 hours per month. This includes employees obtained from a temporary employee agency, leasing concern, or through a union agreement or co-employed pursuant to a professional employer organization agreement ..." 13 C.F.R. Section 126.103. You also provided copies of Requests for Proposals (RFPs) and Invitations for Bids (IFBs) as evidence of job site location, however these documents are not adequate evidence of job site location. As a result, you have only provided adequate evidence to show that 46 RCD employees work at job site locations.

AR at 3022. The court finds that this statement put RCD on notice that a substantial number of its employees were not yet accounted for, in terms of job-site location, and that photocopies of actual contract pages were required as proof of those job-site locations.

The second statement in the email again addressed the shortage in employee work location information:

> SBA has calculated the total number of RCD employees, as that term is defined by SBA regulations. At the time of offer RCD employed 159 individuals and at the time of contract award RCD employed 170 individuals. You have only provided sufficient documentation to evidence that 46 employees work at job site locations. SBA requests a written statement of the job location for all RCD employees, and not just the RCD employees that RCD also claims as HUBZone residents. If the RCD employee works at a job site, please provide the cover of the relevant contract to demonstrate that the place of performance is a job site.

*Id.* Here, SBA set forth the total number of employees for which RCD had to provide either workplace location (for non-job-site employees), or job-site location (for job-site employees).[10] SBA specifically requested a

---

**9.** Some RCD employees did not meet the minimum hours-worked criteria to qualify as employees for HUBZone purposes. According to SBA, there were 11 employees in this category on July 26, 2010, and 21 employees in this category on October 15, 2010. AR at 3027–29.

**10.** SBA did not provide a list of RCD employees by name who worked enough hours to be considered "employees" on those dates. Two payroll registers submitted by RCD contained 173 employee names on July 26, 2010 and 203 employee names on October 15, 2010. AR at 2252–64. SBA could have assisted RCD by identifying the RCD employees by name who would be the focus

"written statement of the job location for all RCD employees." SBA also reiterated that it needed photocopies of certain contract pages (in this email, only the cover of the contract is mentioned) for all of the job-site employees, and reiterated that only 46 employees had been adequately accounted for thus far, in terms of job-site documentation.

SBA next turned to an explanation of the attachment to its email to RCD:

> I have attached a list of the individuals that worked less than 40 hours during the 30 day periods leading up to and ending on the date of contract offer and contract award. You do not have to provide job location information for these individuals, as they are not considered employees according to SBA regulations. Additionally, the attached document contains a list of individuals for whom you have provided RFPs or IFBs as evidence of job site location. Please provide a copy of the contract cover sheet for these job sites. Finally, the attached document contains a list of employees for whom you have already provided adequate job site information. You do not have to provide job location information for these individuals.

*Id.* From this section of the email, RCD was instructed to consult the attachment to the email for three lists of named persons. The first was a list of RCD workers identified on RCD's payroll who were not considered to be employees under the HUBZone program and for whom no job-site information was required. The second was a list of RCD job-site employees for whom *some* documentation of job-site location had been provided, but for whom the documentation was deemed to be inadequate by SBA. SBA thus requested that RCD provide photocopies of contract pages to substantiate the job-site locations for these job-site employees identified by SBA.[11] The third list consisted of RCD employees for whom RCD had already provided adequate workplace location infor-

mation. The title of the attachment to SBA's email is "Principal Office Analysis." AR at 3024.

The Principal Office Analysis attachment to the SBA email (hereinafter, POA) indeed contains three lists of names that correspond to the three lists mentioned in the body of the email. There is a list of RCD workers who were not "employees" due to the number of hours worked in the month prior to proposal submission and contract award. AR at 3027–29. There is also a list of 24 job-site employees for whom RCD provided inadequate contract documentation. *Id.* at 3024–25. Finally, there is a list of 49 employees for whom RCD had provided sufficient documentation for work locations. *Id.* at 3025–27. This list includes 46 job-site employees, and 3 employees in RCD's office in Phoenix. The POA also reiterated SBA's request for a detailed list of RCD employees' work locations: "Please provide a list of the job locations where *ALL* RCD 'employees' perform the majority of their work duties." *Id.* at 3024.

Upon receipt of this email, RCD's burden to establish that its principal office was in a HUBZone was clarified in the following ways. SBA requested a comprehensive list of RCD employees, with a work location identified for each employee, and more specifically, the work location where each employee performed a majority of his or her work. RCD was also given some information as to where the gaps in job-site information were. RCD knew, for example, that it needed to provide better job-site documentation for 24 job-site employees identified by SBA. RCD also knew that for 49 employees identified by SBA, no further job location documentation was required. But by simple arithmetic, RCD, as of November 15, 2010, was instructed to document the job locations of approximately 110 additional employees as of July 26, 2010 and approximately 121 additional employees as of October 15, 2010.[12]

of SBA's work location inquiry, but did not do so.

**11.** The court notes that SBA's instructions regarding photocopies of contract pages were inconsistent. *Compare* AR at 1723 *with id.* at 3022. When read together, the communications from SBA required RCD to provide, at a mini-

mum, photocopies of a contract's first page to document the work locations of job-site employees.

**12.** Because not all of the 49 employees with adequate work location documentation may have worked for RCD on July 26, 2010 *and* October 15, 2010, the exact number of work locations

RCD was given twenty-four hours to provide this information and supporting documentation, due at SBA "by 12:30 PM on November 16, 2010." AR at 3023. About three hours later on November 15, 2010, SBA sent an email requesting additional information from RCD. This email contained no attachments, and in most relevant part asked the following questions:

[D]oes RCD have an office in Tucson or in any other location? If so, please provide the address, and identify the employees that perform the majority of their duties at these offices as opposed to job site locations. Please provide your response by 12:30 pm, November 16, 2010.

AR at 3022.

### E. RCD's Responses to SBA's Requests for Information

#### 1. RCD's November 5, 2010 Response to SBA

The court begins by reviewing RCD's November 5, 2010 response to SBA's first request for information, and finds that RCD's method of reporting each employee's work location was somewhat difficult to decipher. There was no overall table of contents that informed SBA where various types of information could be found in the submission.[13] *See* AR at 1738 (identifying the contents of only three of the eight sections of the November 5, 2010 submission). Within the section of the document devoted to work locations for employees, there is no comprehensive list of employees identifying work locations. AR at 2250–2446. Instead, there are scattered short lists of employees that worked at certain locations, and RCD's request that SBA "[p]lease refer back to the payroll register that also lists the locations where each employee performs their duties." AR at 2250.

The work locations for each employee are not readily apparent in the two types of payroll registers provided by RCD.[14] If one had the time, one could annotate the more compact payroll registers with work location information found in the payroll print-outs provided by RCD, and translate, in many cases, the five-digit payroll codes into actual work locations. The payroll print-outs supplied by RCD are organized by five-digit codes. In many cases, the work location corresponding to a five-digit payroll department code is readily apparent from the payroll print-outs. *See, e.g.*, AR at 1757 ("Casa Grande Outlet Mall" is payroll department 300C7), 1773 ("Tucson Convention Cente[r]" is payroll department 400T2). Other payroll department codes are less easily translated, however. For example, the 300V3 payroll department is labeled "Various Locations." AR at 1765. Another department, 400T1, is labeled "Temp Fill In Tucson." AR at 1772. The court cannot fault SBA for failing to engage in a tedious and ambiguous translation of payroll department codes to determine the work locations of all of RCD's employees.

The primary source of information regarding work locations for RCD employees is what [ ] termed "a spreadsheet." AR at 2250. In actuality, the "spreadsheet" is a series of single pages, each of which contains a header describing a single work location and the relevant contract number (or other identifying information), and a list of employees at that location and the percentage of time these employees spent at that location. These single spreadsheet pages are followed by several pages of photocopies of employee driver's licenses, employee residence HUBZone determinations, and contract pages, at least in some instances. AR at 2265–2446. The court notes that it is difficult to quickly process the information con-

---

remaining to be documented for each date could vary slightly.

**13.** The court, on this record, presumes that the lack of an overarching table of contents is attributable to RCD. The court notes, however, that the state of the administrative record is such that the court cannot rule out compilation errors by the government.

**14.** The court distinguishes between the July and October payroll registers, which are compact alphabetical lists of employees, along with their home addresses and five-digit payroll "department" codes, AR at 2252–64, and the payroll print-outs, which are voluminous print-outs of pay information for several time periods, AR at 1753–2215, organized by five-digit payroll department codes. Both types of documents were labeled payroll registers by RCD.

tained in these 180 or so pages that contain RCD's "spreadsheet."

Nonetheless, one of the spreadsheet pages yielded a list of three persons who worked 100% of their time at the Phoenix office: [ ]. AR at 2440. These were the only non-job-site employees identified by SBA as having adequate documentation of their workplace as of November 15, 2010. *See* AR at 3026. RCD has another office, in Tucson, Arizona, which was alleged by FMH to be RCD's principal office, and an office not located in a HUBZone. AR at 1620.[ ], the one Tucson office employee who works at that office 100% of the time, was not, it appears, included on any of the spreadsheet pages in RCD's Nov. 5, 2010 submission to SBA. On this record, the court finds that SBA rationally examined the information before it, and was confronted with serious omissions which did not, at that time, allow SBA to determine the location of RCD's principal office.

### 2. RCD's Responses to SBA's November 15, 2010 Emails

Throughout the morning of November 16, 2010, RCD sent several documents by facsimile to SBA.[15] *See* AR Tab 19; *id.* at 3018. The administrative record also shows that a series of emails from RCD went to SBA, with attachments, from late morning through the early afternoon. AR at 3005–16. SBA later acknowledged that "SBA did take into consideration all information supplied by RCD on November 16, 2010." AR at 3196. The administrative record appears to contain the entirety of RCD's November 16, 2010 responses to SBA's November 15, 2010 emails,

but the court has, in the interests of thoroughness, consulted both Tab 19 and Tab 21 for a complete record of RCD's November 16, 2010 submission to SBA.[16] AR at 2643–2821, 3020–3135.

RCD's November 16, 2010 submission to SBA contains a letter which responds to SBA's second email dated November 15, 2010. AR at 3030–31. The staffing of the Tucson, Utah and Georgia offices is explained. The letter mentions that RCD has attached a copy of SBA's POA (Principal Office Analysis) which was attached to the November 15, 2010 SBA email sent to RCD. RCD specifically noted that this SBA document included "a list of employees for whom we have already provided adequate job site information." AR at 3030. Apart from this letter, which is very well-organized and clearly presents information requested by SBA, the remainder of RCD's submission is a less-organized compilation of documents regarding cleaning contracts with the City of Phoenix, additional scattered spreadsheet pages of employees working at particular locations, various contract pages, a request for quotations, and about sixty pages of payroll print-outs.

Although the court will discuss RCD's November 16, 2010 submission in more detail *infra*, the court notes two significant problems with RCD's documentation. First, there is no one comprehensive list that matches each RCD employee with the work location where that employee performs the majority of his or her work.[17] There is also a

---

**15.** These transmissions do not appear to have been sent to the SBA fax number specified in the November 15, 2010 emails. *Compare* AR at 3022–23 *with id.* at 3018. Nonetheless, SBA later asserted that all of RCD's November 16, 2010 transmissions were received and considered. AR at 3196.

**16.** There are some pages in the relevant portion of AR Tab 21 that are missing from AR Tab 19, which is labeled "RCD's Second Submission to SBA re HUBZone Status, November 16, 2010." *See, e.g.,* AR at 3072–3135. There are also some pages in AR Tab 19 that are missing from AR Tab 21. *See* AR at 2742–44. Defendant, during oral argument in RCD II, suggested that Tab 19 is the most authoritative version of RCD's November 16, 2010 submission to SBA. The court notes that AR Tab 19 contains many documents which

did not originate with RCD on November 16, 2010, including a document created on November 24, 2010 by RCD's attorney, AR at 2787, and an undated internal document created by SBA, AR at 2816. The record before the court does not suggest that Tab 19 accurately represents what was sent by RCD to SBA on November 16, 2010. For this reason, the court considers both Tab 19 and a portion of Tab 21 to contain documents which were sent to SBA by RCD on November 16, 2010.

**17.** The payroll print-outs submitted on November 16, 2010 may contain some of this information, but similar print-outs submitted on November 5, 2010 were already identified by SBA as insufficient, by themselves, to match each RCD employee with a work location.

shortfall in the number of job locations identified for particular employees. As of November 15, 2010, according to SBA, RCD still needed to identify job locations for approximately 110 additional employees on its rolls as of July 26, 2010 and job locations for approximately 121 additional employees on its rolls as of October 15, 2010. *See supra* note 12. As the court reads RCD's November 16, 2010 submission, approximately 89 additional employee job locations were identified and/or documented for July 26, 2010, and approximately 90 additional employee job locations were identified and/or documented for October 15, 2010.[18] This still left a significant information gap, although the exact number of unsubstantiated work locations is a rather elusive figure, as will be discussed *infra*.

### F. SBA's Consideration of RCD's Submissions of Documentation

The administrative record contains an analysis of RCD's submissions to SBA, the product, according to defendant, of an SBA attorney.[19] AR at 2767–86. That analysis is comprised of four documents. The first (undated) document collates various types of information provided for 83 RCD employees. *Id.* at 2767–71. The second (undated) document appears to be an analysis of RCD's total number of "employees" as of July 26, 2010 and October 15, 2010, and information related to the 35% HUBZone residency requirement. *Id.* at 2772–75. The third document is dated November 16, 2010, and reports the number of RCD employees at certain work locations, and, specifically, reports the number of employees at RCD's offices in Phoenix, Tucson, Utah and Georgia, as well as the percentage of time spent by these employees at these offices. AR at 2776–80. Finally, the fourth

document is a copy of the POA, the attachment to the email that SBA sent RCD on November 15, 2010, as discussed *supra*.

This twenty-page analysis contained in four documents authored by "MKG," appears to be the record of SBA's detailed consideration of RCD's submissions to SBA, and supports SBA's rationale for decertifying RCD from the HUBZone program. The court will first comment on the MKG analysis. The court will next turn to the text of the decertification decision rendered by SBA on November 16, 2010, which was issued a few hours after SBA received the last of RCD's faxes and emails. AR Tab 20. While both the MKG analysis and the SBA status protest decision reveal various flaws in SBA's consideration of RCD's submissions, SBA's conclusion, that RCD failed to establish that its principal office is located in a HUBZone, is not irrational.

#### 1. The MKG Analysis

The MKG analysis of RCD's submissions to SBA contains four important errors. First, MKG concluded that "3 [RCD employees] spend [the] majority of time ... in [RCD's] Phoenix [office]." AR at 2776. RCD, however, had shown that six employees spent the majority of their time in its Phoenix office, which is located in a HUBZone. *See* AR at 2440, 3027 (MKG's POA), 3069. Second, MKG concluded that 24 employee job-site locations in RCD's November 16, 2010 submission were not supported by contract documentation. AR at 2776–77. Yet, each of the spreadsheet pages identifying these employee job-site locations contained the notation "Contract provided 11/05/2010," AR at 2742–45, 2752–53, an assertion that is correct, *see* AR at 3025–27 (MKG's POA, noting that on November 5, 2010 RCD had already supplied contract doc-

**18.** The court conducted its own analysis of RCD's submissions, and did not rely on the parties' arguments regarding the completeness of work location information provided to SBA. In particular, the court did not rely on plaintiff's explanatory charts, attached to its briefs in either this case or *RCD II*. The court relied, instead, on RCD's payroll registers and payroll summaries submitted to SBA on November 5, 2010, the POA, RCD's November 16, 2010 submission to SBA, and SBA's analysis of RCD's November 16,

2010 submission, which is discussed *infra*. By proceeding in this manner, the court analyzed RCD's submissions to SBA to determine whether or not SBA's conclusions regarding these submissions were rational. Explanatory charts that were not before SBA are not relevant to this inquiry.

**19.** The nature of this document remained unexplained until oral argument in this case.

umentation for these job-site locations).[20] These first two errors show that MKG, perhaps due to time constraints, was not considering whether certain information in RCD's November 5, 2010 submission supplemented information in RCD's November 16, 2010 submission.

The third error is also indicative of inadvertence on the part of MKG. Three spreadsheet pages in the November 16, 2010 submission identify job locations that are not mentioned in MKG's analysis, although the analysis comments on all other job locations submitted by RCD on that date, as either documented or unsupported by documentation. *See* AR at 3064–66. All of these spreadsheet pages contained the notation "Contract provided 11/05/2010," *id.*, and for two of these job locations, there is indeed evidence of contract documentation in RCD's November 5, 2010 submission, *see* AR at 2385, 2397, 2408–09, 3026–27.[21] The third work location, "AFNI # 2 Foothills," was not noted in MKG's POA as one of the sites for which contract documentation had been provided by RCD on November 5, 2010.[22] The court interprets the record to indicate that MKG neglected to count seven job-site employees as being adequately documented by RCD, by failing to notice these three spreadsheet pages.

The fourth error in the MKG analysis concerns the number of job-site locations adequately documented in RCD's November 16, 2010 submission. MKG found that 80 job sites were adequately documented. AR at 2776. The court believes that MKG's count of RCD employees with adequate work location documentation in RCD's November 16, 2010 submission, when corrected for the undercounting noted above, would have been much higher. The court acknowledges that

it would be difficult to state exactly how much higher the count would have been.

One of the problems with this case is the confusion surrounding the documentation goals of SBA. RCD's payroll registers for July 26, 2010 and October 15, 2010 contained 173 and 203 names, respectively. AR at 2258, 2264. SBA determined that RCD had eleven employees who were not "employees" for HUBZone purposes on July 26, 2010, and twenty-one employees who were not "employees" on October 15, 2010, and identified these individuals in its November 15, 2010 email to RCD. AR at 3027–29. In the court's view, this could leave 162 RCD employees in July, and 182 RCD employees in October, for whom additional documentation was required.

SBA informed RCD, however, that it only had to provide work location documentation for 159 and 170 employees, respectively, for these dates. AR at 3022. The only explanation the court has found is that MKG appears to have relied on RCD's payroll records, perhaps the voluminous print-outs covering several pay periods, to determine the total number of RCD employees in July and October, and arrived at figures which did not match the numbers provided by RCD in its payroll registers. *Compare* AR at 2258, 2264 *with id.* at 2772–73 (showing that instead of finding that RCD had 173 and 203 total employees on the relevant dates, MKG found that RCD had 170 and 191 total employees on the relevant dates). The court does not know whether MKG's figures or RCD's payroll registers provide more accurate numbers. In any case, RCD had no guidance from SBA as to which 159 "employees" of its remaining 162 employees on the payroll register were to be accounted for, in July, and which 170 "employees" of its remaining 182

---

**20.** In one instance, for the job-site location "SE Carlson Clinic," the court could not locate the contract documents in RCD's November 5, 2010 submission to SBA. Nonetheless, MKG noted in the POA that such documents were submitted. *See* AR at 3025. This notation by MKG indicates that some pages of RCD's November 5, 2010 submission to SBA, reportedly presented in AR Tab 18, may be missing from the record before the court.

**21.** For one of these work locations, the court was unable to locate contract documents, although MKG's POA indicates that such documents were submitted. *See supra* note 20.

**22.** Because of the state of the record, the court cannot presume that RCD did not submit contract documents for this work location. Nonetheless, on this record, the court cannot include these two employees in its count of adequately documented job-site employees.

employees on the payroll register were to be accounted for, in October.

The court hesitates to rely on MKG's total employee figures. If, however, these figures are accurate, and MKG's POA is accurate, and the portions of MKG's analysis of RCD's November 16, 2010 submission not identified as faulty by this court are accurate, RCD appears to have provided adequate work location information for 153 of its 159 employees on July 26, 2010, and 157 of its 170 employees on October 15, 2010. The court's own analysis, based largely on RCD's payroll register and RCD's payroll summaries of hours worked, as well as MKG's corrected analysis of the information contained in RCD's two submissions to SBA, shows that 24 employees on the July register were never matched with the job locations where they performed the majority of their work, and 32 employees on the October register were never matched with the job locations where they performed the majority of their work.[23]

Perhaps the payroll registers and payroll summaries are not the most accurate documents provided by RCD to SBA, but these are the documents from which employee information is most readily extracted. Even when the court excludes from the payroll registers employees RCD never mentioned in its payroll summaries, for July there are still 12 employees lacking information as to where they performed the majority of their work, and for October, there are still 19 employees lacking information as to where they performed the majority of their work. Among these individuals are the RCD employees who spend a minority of their time in an office, and, necessarily, a majority of their work time not working in that office. The

Phoenix office has three employees in this category; the Tucson office also has three employees in this category.[24] If, as it appears, SBA could not proceed with a principal office analysis without documentation for every employee's work location, the record before the court shows that RCD failed to provide that perfect level of documentation.

Thus, although the court must emphasize that the MKG analysis of RCD's two submissions to SBA was fraught with errors and did not in all instances accurately describe employee work location information provided by RCD, the MKG analysis correctly indicated that RCD had failed to provide work location information for all of its employees. In that regard, the MKG analysis does not fundamentally differ from the court's analysis of the record. The court now turns to SBA's status protest decision, which largely adopts the MKG analysis, and raises other issues.

### 2. SBA's Resolution of the Status Protest

■ SBA's resolution of FMH's challenge to RCD's HUBZone status was issued on November 16, 2010 by Ms. Mariana Pardo, Deputy Director of the HUBZone Program at SBA. AR at 2822, 2833. This decision states that "RCD did not meet the principal office requirements at the time it submitted its offer and at the time of contract award." AR at 2822. The primary ground for this determination appears to be SBA's finding that "RCD did not provide a sufficient amount of information for SBA to determine the work location for each of RCD's employees." AR at 2830. As discussed *supra*, the record shows that RCD did indeed fail to

---

**23.** The court only counted employees who were reported by RCD as having been paid for at least forty hours in the four weeks preceding the date in question.

**24.** SBA apparently did not count a Tucson office employee, who worked there 50% of his time, as a *Tucson office employee for the purposes of the* principal office analysis. AR at 2777, 2832. This may be a permissible interpretation of the definition of principal office found in 13 C.F.R. § 126.103, but SBA has not made its position on such questions known to the public. The court notes, however, that this employee, as a matter of mathematics, could not have spent the majority

of his time at job-site locations. Furthermore, the record is devoid of any indication that this individual worked at any other RCD office. Because of the ambiguity in the regulation concerning where to allocate 50%–50% office employees, and the lack of information as to SBA's interpretation of its governing regulation, the court considered this individual to have been adequately documented as a Tucson office employee. A change in this individual's work location categorization, from a Tucson office employee to an employee with inadequate work location information, would not fundamentally alter the court's analysis.

provide work location information for each of RCD's employees.

SBA relied heavily, it appears, on the MKG analysis to reach this conclusion. All of the key figures from the MKG analysis appear in the text of Ms. Pardo's decision, where that decision discusses RCD's work location documentation. *Compare* AR at 2830 (finding that there were 159 RCD "employees" on July 26, 2010; that 49 work locations were documented in RCD's November 5, 2010 submission; and, that 104 work location allegations were presented in RCD's November 16, 2010 submission (of which 24 were deemed to be invalid)) *with* AR at 2772, 2776, 2782–84 (same). Ms. Pardo concludes that RCD's work location documentation was inadequate for 30 employees as of July 26, 2010, and that RCD's work location documentation was inadequate for 41 employees as of October 15, 2010. Although the court has shown that these figures are inaccurate; as concerns the total number of work locations adequately identified by RCD, SBA's errors in this regard are merely a matter of degree. SBA had requested, and had not received, sufficient work location documentation for each RCD employee on its payroll.

SBA stated two additional reasons for its decertification decision. First, for seven employees reported by RCD to work in an office less than 100% of the time, SBA stated that "[w]ithout further information that clarifies where these employees perform the majority of their work, SBA cannot determine the location of the RCD principal office." AR at 2832. The court agrees with SBA that clarifying information regarding these employees might conceivably have made a difference in SBA's principal office analysis, considering the number of work locations of other employees that could not be determined from

RCD's submissions to SBA.[25] The final reason cited by SBA for decertifying RCD was that Ms. Pardo was "making an adverse inference that RCD's principal office is not located in a HUBZone," because RCD had failed to provide sufficient information to SBA. *Id.*

The case for making an adverse inference is less than clear. If SBA had more promptly presented its initial request for information to RCD, and if SBA had been more helpful in assisting RCD in filling in the gaps in its work location information, the regulation would have supported an adverse inference, if RCD had then failed to document where its employees worked. *See* 13 C.F.R. § 126.403(a). Here, SBA never provided RCD with a list identifying the 159 (July 26) and 170 (October 15) employees for whom it required such information.[26] RCD was thus compelled to document the work location of every RCD employee on its payroll for these two dates. Here, SBA informed RCD that the only way to document work locations for job-site employees was to provide photocopies of cover sheets and place of performance pages from numerous contracts.[27] AR at 1723. RCD, it appears, attempted to track down all of these contract pages, where such documents existed, and still fell short of documenting each employee's work location. Here, too, SBA's requests for work location data failed to suggest a particular format that would satisfy SBA's need for documentation. RCD, perhaps naively, appears to have expected that its payroll print-outs, payroll registers, payroll summaries, and spreadsheet pages would allow SBA to determine that its largest office was in Phoenix and in a HUBZone. *Cf.* AR at 2556 (RCD's organizational chart, submitted to SBA on November 5, 2010 as part of the copy of its

---

25. The court acknowledges that it is difficult to conceive of a scenario which would make this information dispositive of a principal office analysis. Nonetheless, the court cannot say with certainty that this type of information was irrelevant.

26. The record does not contain such a list, to the court's knowledge. Indeed, SBA may never have generated such a list. On November 16, 2010, SBA's focus appeared to be on the *number* of employee work locations documented by RCD,

not on whether every individual "employee" on RCD's payroll was adequately documented as to work location. *See* AR at 2776.

27. SBA's Standard Operating Procedures suggest that "records" be used to "identify the job-site location at which each employee performed his or her work and the contract number for that job-site location," but does not mandate the submission of photocopies of contracts. SOP 80 06 Ch. 3(9)(d).

proposal for the Army contract in Hawaii, showing that RCD's Phoenix headquarters/office had more staff than any of its other offices).

The court acknowledges that SBA requested comprehensive work location information that would explain where each RCD employee worked for the majority of his or her time. SBA's requests in this regard, however, did not tell RCD how to provide that information. Indeed, SBA's requests were vague, varying and confusing, and were ill-tailored to the goal of getting pertinent information from RCD in a short time-frame.

One version of SBA's information request, sent October 29, 2010, demanded "records indicating the location at which each employee performed his/her work at the time RCD submitted its offer and at the time of award." AR at 1723. Note that this request does not discuss "majority of time worked," in the context of office employees. Note, too, that only "records" are required, and that RCD was given no indication of the format of these records. RCD was also required to send along photocopies of contract pages documenting the locations of most of its employees. The burden of assembling this information in a coherent manner was left to the discretion of RCD.

The next general request for this type of information, sent by email on November 15, 2010, stated that "SBA requests a written statement of the job location for all RCD employees, and not just the RCD employees that RCD also claims as HUBZone residents." AR at 3022. In this communication, SBA requested a "written statement," again, in a format not identified. Attached to this email is another general request for work location information: "Please provide a list of the job locations where *ALL* RCD 'employees' perform the majority of their work duties." AR at 3024. This SBA request, provided as an introduction to an attachment to an email, asks for a "list" which must address the location where a majority of duties are performed by each employee. The need for photocopies of contract pages is reiterated on November 15, 2010, although in this iteration SBA asked only for contract cover pages. AR at 3022.

Finally, regarding RCD's Tucson office, the second email sent to RCD on November 15, 2010 requested information concerning the work locations of the Tucson office employees: "[P]lease provide the address [of the Tucson office], and identify the employees that perform the majority of their duties at these offices as opposed to job site locations." *Id.* By the afternoon of November 15, 2010, RCD had received several SBA requests for employee work location information, expressed differently in different communications, and was given twenty-four hours to comply with all of these requests.

The court cannot approve of the adverse inference drawn by SBA. The short time-frame was exacerbated by SBA's lack of diligence in processing the status protest. The communications with RCD were confusing, and did not assist RCD in understanding how it could satisfy SBA's evolving documentation requirements. To the court, RCD appears to have attempted to cooperate with SBA in a reasonable manner. The court rejects the adverse inference drawn by SBA, but, in the final analysis, SBA had sufficient grounds to decertify RCD without drawing an adverse inference.

The government asserts that SBA's methodology for determining the location of a HUBZone concern's principal office is to determine the total number of employees, determine where each employee does the majority of his or her work, exclude job-site employees from the principal office analysis for service industry concerns, and then compare head-counts of employees who work at the concern's offices. As shown by SBA's analysis in the record before the court, this is a cumbersome and tedious process, and prone to error when SBA and the contractor are rushed. When time is short, SBA risks decertifying a legitimate HUBZone contractor merely because that concern cannot remove every shred of uncertainty over the work locations of its far-flung job-site employees, when the staffing of its offices would be relatively simple to explain and document. The court, however, must defer to SBA's

expertise in these matters.[28] Because RCD did not provide work location information for each of its employees, this court is constrained to find that SBA did not have sufficient information to perform its principal office analysis.

## VIII. The Appeal

■ On December 21, 2010, Mr. Joseph G. Jordan denied RCD's appeal of SBA's decertification decision. AR at 3196, 3200. Mr. Jordan ruled that the decision should stand, and although he did not explicitly state that an adverse inference was warranted in the status appeal decided against RCD, much of his decision rebuts RCD's allegation that an adverse inference was unwarranted. He stated, for example, that

> SBA provided detailed and helpful information to RCD, in order [to] help it better comply with the additional requests SBA made. SBA provided lists and other useful information so that RCD knew what information needed to be provided, and so that RCD did not waste time producing duplicative information. It was clear from the SBA requests that SBA needed to know the location at which all RCD employees worked in order to determine its principal office location.

AR at 3197. Mr. Jordan also noted that the information requested by SBA was not irrelevant to the principal office analysis. *Id.* at 3199.

Although the court disagrees with Mr. Jordan as to the helpfulness of SBA's communications with RCD, the court accepts his description of the methodology that SBA uses to perform a principal office analysis for the HUBZone program:

> SBA cannot determine a firm's principal office without adequate evidence of several

key facts. First it must determine the total number of employees that the firm employed at key time periods. As noted in SBA's request on November 15, 2010, SBA did this and even informed RCD of its conclusions with regard to this key issue. Next, SBA must allocate each employee of the firm to either a job site or an office location. SBA must have adequate evidence of where every individual performed his/her work in order to make a determination of [a] firm's principal office. This is required by the definition of principal office noted above.... In order to make this determination SBA must have documentation and evidence showing where each and every employee performed his/her work. SBA cannot make a determination that the greatest numbers [of] employees work at a given location, without knowing how many employees there are, and where all the employees work.

AR at 3198–99. And although Mr. Jordan relied on many of the inaccurate figures produced in the MKG analysis and Ms. Pardo's decision that overstated the gaps in the work location information provided by RCD, his conclusion that "RCD failed to produce information showing where its employees were performing their work" is unassailable. AR at 3199. Given the highly deferential standard of review that applies in bid protests, the court finds that SBA's rejection of RCD's appeal of the decertification decision was reasonable and may not be set aside. The court observes, however, that a review and overhaul of SBA's boilerplate request for principal office location documentation would serve both SBA and its HUBZone contractors well.

## CONCLUSION

Because RCD has not prevailed on the merits, the court need not examine the fac-

**28.** Plaintiff suggests that SBA could and should have made a principal office determination based on the information in the record before SBA. Pl.'s Mot. at 6; Pl.'s Reply at 6. In essence, plaintiff asks the court to conclude that the record before SBA was sufficient to establish that RCD's principal office, as defined by the HUBZone regulation, was in Phoenix and in a HUBZone, and that any doubts SBA had as to the location of RCD's principal office were irrational. The record, despite plaintiff's strenuous attempts to explain it, is not that clear. RCD's incomplete work location information was not irrelevant to a principal office analysis, and SBA's uncertainty as to the location of RCD's principal office was not irrational. The court acknowledges that SBA, proceeding differently, might have obtained more useful documentation and might well have been able to confirm that RCD's principal office was in Phoenix and in a HUBZone. Nonetheless, SBA's decision to employ a rational, if unwieldy, analytical framework is entitled to deference from this court.

tors to be considered when this court considers a request for injunctive relief. Plaintiff's challenge to SBA's decision decertifying RCD from the HUBZone program, and its challenge to SBA's rejection of its appeal of that decision, both fail. Defendant's and intervenor-defendant's motions for judgment on the administrative record are granted, and plaintiff's motion is denied.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Preliminary Injunction, filed January 6, 2011, is **DENIED;**

(2) Plaintiff's Motion for Judgment on the Administrative Record, filed January 31, 2011, is **DENIED;**

(3) Defendant's Motion to Dismiss, filed February 11, 2011, is **DENIED;**

(4) Defendant's and Intervenor–Defendant's Cross–Motions for Judgment on the Administrative Record, filed February 11, 2011, are **GRANTED;**

(5) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant;

(6) On or before **April 8, 2011,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(7) Each party shall bear its own costs.

